## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ALEXIS DOE, | |
| *Plaintiff,* | |
| v. | Civil Action File No. |
| MOREHOUSE COLLEGE, INC., and CLARK ATLANTA UNIVERSITY, INC., | **DEMAND FOR JURY TRIAL** |
| *Defendants.* | |

## COMPLAINT FOR DAMAGES

Plaintiff for her Complaint against Defendants, MOREHOUSE COLLEGE, INC. and CLARK ATLANTA UNIVERSITY, INC., states as follows:

## PARTIES

1.     Plaintiff is a current graduate student at Columbia University and recent graduate of Spelman College ("Spelman"), an all-women's institution, as well as a former student and employee of MOREHOUSE COLLEGE, INC.  She is an African American female by race and gender.

2.     Defendants, MOREHOUSE COLLEGE, INC. ("MOREHOUSE") and CLARK ATLANTA UNIVERSITY, INC. ("CLARK") are two out of the four

Historically Black Colleges and Universities ("HBCUs") that make up the Atlanta University Center Consortium ("AUC").

## NATURE OF THE LAWSUIT

3.     Plaintiff brings this civil rights action alleging a pattern and culture of gender violence and discrimination at Defendants' institutions where complaints of sexual assault are deliberately ignored and/or delayed until after graduation of one or both students, and where offending students are ultimately not held responsible as a matter of policy.  This culture is directly responsible for encouraging acts of sexual violence and inflicting a hostile educational environment on many female Spelman students.

4.     Contributing to this culture is the belief that because Black men suffer heightened discrimination, harassment, and violence in society, schools such MOREHOUSE and CLARK must make special effort to assist their male students in successfully graduating from college.  These efforts unfortunately include shielding male students from discipline that might result from complaints involving sexual assault.  The result of this troubling dynamic is that female students at the AUC are expected to bear in silence the schools' tolerance of sexual assault perpetrated upon them.  These policies and practices have created a culture of sexual

violence at MOREHOUSE, as perpetrators face little to no consequence and may act out towards their female counterparts with impunity.

5.     Further contributing to this culture of sexual violence at the all-male MOREHOUSE is the typically all-male climate of "hypermasculinity," which emphasizes and prioritizes male stereotypical behaviors such and physical strength, aggression and sexuality.

6.     Amidst this culture of hypermasculinity and expectation of loyalty, Plaintiff was raped by one such MOREHOUSE student.  On June 18, 2018, Plaintiff reported to the MOREHOUSE Title IX coordinator that a MOREHOUSE student Jermiyah Kelly, "JK" had sexually assaulted her.  Mr. Kelly is an African American male by race and gender.

7.     MOREHOUSE's Title IX coordinator responded to this report by telling Plaintiff that she personally knew JK and his family and that such an allegation would "ruin his life," by reminding Plaintiff that JK was a first-generation MOREHOUSE student, and by discouraging Plaintiff from proceeding with her report.

8.     The implication from these remarks was that regardless of what had happened to her, Plaintiff should not pursue her complaint, given the impact it would have on her assailant and his future professional career as a pastor.

9.     Sensing the resistance from MOREHOUSE, Plaintiff reported the matter to the Atlanta Police Department who referred the matter back to MOREHOUSE Campus Safety Police.

10.     Despite the resistance from MOREHOUSE, Plaintiff persisted in her complaint, setting forth several provable allegations from extortion to sexual violence, and she pursued the Title IX process diligently.

11.     Unlike Plaintiff, MOREHOUSE did not pursue the matter diligently, and the process would not conclude until nearly two years later and, more significantly, shortly after Plaintiff had graduated from Spelman.  At that time, MOREHOUSE found its student, JK, not responsible.

12.     During those two years, Plaintiff suffered physical retaliation from JK, additional harassment, and multiple violations of a no contact order.  Though those instances were promptly reported, MOREHOUSE imposed no discipline or other protective measures to keep Plaintiff safe.

13.     Also, during that time, Plaintiff suffered retaliation from JK's friends, three CLARK students who assaulted her at a homecoming party.  Though Plaintiff filed a complaint to CLARK regarding the assault, no Title IX process was instituted by CLARK.  As a result of this inaction, Plaintiff refrained from enrolling in classes only offered at CLARK, despite their applicability and necessity to her major.

14.     As a result of Defendants' inactions, Plaintiff suffered from a constant hostile educational environment, in fear of even being present on two of the three AUC undergraduate campuses.   She avoided classes and other resources on MOREHOUSE and CLARK's campuses, changed her major to avoid further harassment, and lived and attended classes in fear of the further retaliation.

15.     Pursuing an education in such an environment is precisely what Title IX is designed to prevent.

## JURISDICTION AND VENUE

16.     Defendant MOREHOUSE COLLEGE is an all-male private educational institution with its primary campus in Atlanta, Georgia.

17.     Defendant CLARK ATLANTA UNIVERISTY ("CLARK") is a private educational institution with its primary campus in Atlanta, Georgia.

18.     Both MOREHOUSE and CLARK receive substantial federal funding in many forms, including federal student aid, and as such are subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

19.     This Court has jurisdiction over this action under 28 U.S.C. §1331 and 28 U.S.C. §1367.

20.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1) and (2).

## THE ATLANTA UNIVERSITY CENTER CONSORTIUM

21.     Four Historically Black Colleges and Universities make up the AUC, a closely affiliated collection of schools sharing adjoining campuses and offering cross enrollment of classes. Additionally, the various schools that make up the AUC share many educational resources and opportunities offered to all AUC students.  For example, the main library for the AUC is housed on CLARK's campus and certain classes available to Spelman students are only offered at CLARK or MOREHOUSE. The intent of the consortium is to give students broad access to educational opportunities at all AUC schools regardless of which school they are primarily enrolled.

## A CULTURE OF DISCRIMINATION AT MOREHOUSE

22.     *"Misogynoir" refers to the misogyny primarily experienced by Black women. As the plight of the Black man in America remains at the forefront of social discourse, Black women and their needs, rights and obstacles are largely erased and ignored.  In the context of sexual violence, their voices are often overlooked and their reports dismissed.*[1]

23.     In an era rife with ongoing and elevated racial tension and discrimination, HBCUs such as MOREHOUSE represent to the students seeking

---

[1] "Misogynoir" is a term coined by Black feminist Moya Bailey.

admission "much sought after Black empowerment in an American society that has continually profited from black subjugation."   Grace Elletson, *Morehouse Is Criticized – Again – for Its Handling of Sexual Misconduct*, Chronicle of Higher Education, July 22, 2019, https://www.chronicle.com/article/morehouse-is-criticized-again-for-its-handling-of-sexual-misconduct/. Moreover, HBCUs are promoted as academic "safe havens," espousing family environments that provide a social and psychological buffer from an often racially hostile society.

24.     As part of the MOREHOUSE brand, the school emphasizes its goal of making "Morehouse Men," a self-imposed and universally-adopted label designed to emphasize the well-rounded nature of the education and the resulting leadership qualities of its graduates.

25.     While this focus on confidence and attitude is understandably worn with pride by undergraduates and alumni alike, the label has also taken on a hypermasculine context on campus in recent years, as the traditional Morehouse Man's ambition and drive have been distorted by some into an overbearing sense of entitlement.   MOREHOUSE's emphasis to its students that they are elite combined with the school's lack of holding students accountable for sexual violence has encouraged a culture that endorses sexual misconduct perpetrated on their female counterparts at the AUC.

26.     In its emphasis on the leadership qualities of its students, MOREHOUSE has engaged in a pattern of ignoring or deliberately playing down allegations of bad actions on the part of those students, especially where such allegations involve sexual misconduct. Though many Morehouse men epitomize the very best qualities of their community despite these paraded messages, for many other students at Morehouse, the aggrandized culture has led to a lack of respect toward and violence against women.

27.     Predictably, in recent years MOREHOUSE has faced numerous reports of ignoring and generally mishandling reports of sexual assault and of fostering a culture of sexual violence.

28.     The culture that has been developed at MOREHOUSE allows sexual violence to run unchecked and leaves women at the AUC far more vulnerable to its recurrence.

29.     MOREHOUSE lacks sufficient education on consent and sexual misconduct to combat the many other messages sent to young men about the school's tolerance of sexual harassment and violence.

30.     It is in the context of this culture of tolerance and willful ignorance of sexual violence, that in October 2017, Plaintiff was raped by JK.

## POLICY OF IGNORING SEXUAL VIOLENCE AT MOREHOUSE

31.     Plaintiff became aware of the dangerous and discriminatory culture at MOREHOUSE in the Spring of 2019 after her own experience at MOREHOUSE continued to spiral.  From talking to other survivors, including female students who had become survivor advocates to address the gender-based injustices at MOREHOUSE, Plaintiff learned that the hypermasculine culture that existed at the all-male school not only served to discriminate against female students making complaints about sexual misconduct, but was also encouraging some male students to engage in sexual misconduct under the belief that there would be no consequences or the belief that such behavior was acceptable, as at MOREHOUSE, apparently it was.

32.     In April and May of 2019[2], months after reporting her sexual assault, Plaintiff, largely through reading media accounts as well as outreach to other survivors of sexual assaults from MOREHOUSE students, became aware of the following:

      a.     That MOREHOUSE's Title IX office was in a constant state of transition.  Indeed, MOREHOUSE is currently on its 8th Title IX coordinator in just the past six years.[2]

---

[2] Plaintiff and Defendants have operated under a tolling agreement since March 9, 2021.

9

b.    In March of 2014, a Spelman student was raped by her MOREHOUSE boyfriend and reported the rape to Spelman and MOREHOUSE.   MOREHOUSE asked the student to sign a document declining to press criminal charges as well as a no-contact order that barred her from MOREHOUSE campus. MOREHOUSE Title IX coordinator Doris Coleman remarked to the female student that young men are at the "peak of their testosterone."

c.    In November 2015, MOREHOUSE students drafted the "Hoe Contract" and circulated this on campus asking "hoes" to agree to allow dorm residents "to perform any and all sexual behavior on me from the time I walk in til the time I leave," agree to "not spread misleading truths and/or ignominious lies" (presumably about being assaulted), and threatens that violators will "be exposed campus wide as a lying bitch."

d.    In 2015, the Department of Education Office for Civil Rights opened an investigation into MOREHOUSE's handling of sexual assault reports.

e.    That eight months before she was raped, MOREHOUSE's new Title IX coordinator Beverly Gooden resigned after just 30 days on the job; Gooden apparently stated that the Title IX office "was overwhelmed with

cases," and had a "culture of hypermasculinity" which included male leadership stifling reports; Gooden reported that "she was shocked by the number of unresolved cases. Some had been open for so long, she said, that the students who filed them had graduated with their complaints still unresolved"; "[w]e had victims of assault with no resolutions for years . . ." Gooden likened the culture to a heavy blanket that kept her from enforcing Title IX.

f.    Gooden further indicated that there was a lack of urgency from MOREHOUSE to invest in training and other resources needed to fix the problems.

g.    In the past several years, many complainants were discouraged from pursuing complaints, many were blamed for their assaults, and many reports were simply ignored until one of the two involved students graduate and left campus, thus theoretically relieving the issue for the school.

h.    MOREHOUSE's attitude of indifference/hostility towards addressing sexual assault was particularly rampant in its campus security force, which has a history of victim-blaming students. As an example, one survivor who walked past campus security in shorts and a t-shirt and was told, "when you get raped, don't come crying to us."

i.     On information and belief, panelist fact finders in the Title IX process are often not trained on sexual assault, in clear violation of federal law.

j.     Despite the high prevalence of sexual violence on campus, MOREHOUSE campus safety statistics publicly reported just four incidents of sexual assault in 2017, one instance in 2016, and two instances in 2018.

k.     Perpetrators at both MOREHOUSE and CLARK are frequently not disciplined for violating "no contact" or "persona non grata" orders issued by the schools and designed to protect complainants of sexual abuse cases.

l.     MOREHOUSE has a history of finding complaining victims responsible for alcohol violations that occur the night of their assault, which discourages other survivors from reporting.

m.     Some students have dropped their cases due to inaction on the part of MOREHOUSE, and in other instances, MOREHOUSE itself abandoned the matter altogether.

33.     In early November 2018, CLARK student Alexis Crawford was found dead after reporting a sexual assault committed by the boyfriend of Ms. Crawford's roommate, Jordyn Jones.   The boyfriend and Ms. Jones are currently being prosecuted for Ms. Crawford's murder.

34.     MOREHOUSE is currently under multiple investigations by the Department of Education for their handling of reports of sexual assault.

## JK'S SEXUAL ASSAULT OF PLAINTIFF

35.     As a result of the aforementioned culture, Plaintiff was subjected to sexual violence at the hands of JK.

36.     On October 17, 2017, the sophomore Plaintiff was invited over to the apartment of JK, a MOREHOUSE Student with whom she was involved.

37.     At the time, Plaintiff was enrolled in classes both at Spelman and at Morehouse.

38.     On one prior occasion, the two students had had intercourse in a manner that was painful to Plaintiff and left her both bleeding and in tears.  In the months thereafter, JK messaged Plaintiff that he wanted to try again and this time see if "she could take it," apparently referencing her previous crying in pain.

39.     Once at his apartment, JK indicated his desire to have intercourse and Plaintiff refused.  As an excuse to avoid intercourse, Plaintiff noted that JK lacked any means of contraception and Plaintiff did not want to become pregnant.

40.     As the two students began kissing, JK became forceful and held Plaintiff down.  JK raped Plaintiff and ejaculated inside of her and Plaintiff left the apartment.

41.    Plaintiff did not initially report the abuse and she soon would learn that she was pregnant from the rape.

42.    Plaintiff struggled with school in the aftermath of the rape, and in the fall of 2017, she had to repeatedly email professors about being unable to come to class or take exams.  This was the first time Plaintiff had ever sent such emails.

43.    Plaintiff informed JK of the pregnancy.  She told him that this was "on him" as she said "no" and he didn't listen to her.  JK pleaded with Plaintiff to not disclose what had happened as he wanted to become a pastor in the future, and this would ruin his career.

44.    Shortly thereafter, Plaintiff received a voice memo from JK's mother, whom JK had previously indicated had a history of violent crime.  In that voice memo, JK's mother threatened Plaintiff that she needed to drop her claims against JK.

45.    In the wake of that threat, Plaintiff chose not to report the assault and she and JK agreed to terminate the pregnancy.

46.    JK though would soon change his mind and begin to harass Plaintiff about the decision to terminate the pregnancy, even becoming so loud and abusive at the clinic where the procedure was to take place that JK was asked to leave by staff members.

47.     Following these events, JK saw an opportunity and began a pattern of extorting money from Plaintiff in exchange for his silence about the terminated pregnancy.  JK threatened to tell Plaintiff's family about the terminated pregnancy if she didn't pay him money.  Plaintiff reported this behavior to MOREHOUSE in the Spring of 2018.

48.     As the extortion progressed, Plaintiff, though uncomfortable reporting the rape, felt the need to report at least some of JK's conduct and request a no contact order from her school, Spelman College.

49.     In February 2018, Plaintiff reported the extortion to Spelman College in hope of receiving a no contact order without having to disclose having been raped. Spelman indicated they would forward her complaint to MOREHOUSE.

50.     Plaintiff did not hear back from MOREHOUSE for two months, ultimately being informed by Title IX Coordinator Terraine Bailey that they were just "too busy to respond sooner."

51.     JK continued to harass and threaten Plaintiff.  In late February 2018, JK threatened Plaintiff by sending her a message that his "sisters" were going to beat her up.  JK also posted a picture on social media of a handgun.  JK's friends from CLARK also began harassing her on social media and making threatening comments.

52.     On March 18, 2018, JK verbally and physically confronted her in a hostile fashion with several other MOREHOUSE male students and again threatened to "beat her up."   Plaintiff was afraid for her physical safety and reported this incident to MOREHOUSE.

53.     On April 4, 2018, Plaintiff met with Nicole Johnson, Spelman's Title IX Compliance Director, and requested a No Contact Order ("NCO") be issued against JK.  Plaintiff initially reported only the extortion, as she had hoped that the harassment might end without going into the painful details of the sexual assault.

54.     On April 14, 2018, she received a No Contact Order or "Persona Non Grata" from Spelman only prohibiting JK from coming onto Spelman's campus and having any contact with her.   Plaintiff remained unprotected from JK on both MOREHOUSE's campus as well as CLARK's.

55.     On April 16, 2018 Plaintiff filed a complaint against JK and submitted a statement in support of same.

56.     Plaintiff then scheduled a meeting with then MOREHOUSE Title IX coordinator Terraine Bailey.  On the date of the meeting, Plaintiff and her mother, who had driven nine hours to be at the meeting to support her daughter, showed up for the meeting but Ms. Bailey did not.

57.     The meeting was rescheduled for the following week, and Plaintiff intended to report her sexual assault at that time.  In that meeting, Terraine Bailey informed Plaintiff that she personally knew JK and his family and that this allegation would ruin his life.  Terraine Bailey noted that JK was a "first generation" student who "had a lot to lose," a reference to being the first in his family to attend MOREHOUSE, and she encouraged Plaintiff to withdraw her complaint.  Bailey pointed out that JK was trying to become a pastor and these allegations would affect his goals.  Terraine Bailey inappropriately commented that as a former prosecutor, she could advise Plaintiff that her sexual assault allegations would never hold up in court.  Furthermore, Terraine Bailey directly suggested that Plaintiff was lying and threatened that if she went forward with this, JK would file a complaint against her for lying.  Given the critical reaction of the Title IX coordinator, Plaintiff did not proceed with an official report of the sexual assault at that meeting.

58.     On April 27, 2018 one of the friends of JK and a CLARK student posted a photo on social media of JK and one of the CLARK female students with the caption "Payback is a mother" giving Plaintiff the strong message that she had better keep quiet.

59.     In May of 2018, immediately following the conclusion of the semester, Plaintiff remained on campus to prepare for a school trip to South Africa.  On the

second to last day of school, Plaintiff began getting additional threats via Twitter from three students at CLARK. Spelman allowed Plaintiff to move into temporary housing for her safety, though ultimately Plaintiff still felt unsafe remaining on campus and moved home, missing the pre-trip classes in preparation.

60.   On June 18, 2018, realizing that JK was not going to cease his harassment, Plaintiff officially reported the sexual assault to MOREHOUSE.

61.   In August 2018, JK was arrested for extortion while the Atlanta Police Department was investigating the sexual assault. In December 2018, Plaintiff discussed the case with a Detective at Atlanta PD who said they were closing their case based upon a conversation with the MOREHOUSE Title IX office.

62.   On September 17, 2018, Plaintiff sought and received a temporary protective order from the Fulton County Superior Court preventing JK from contacting Plaintiff. JK was served and a hearing was held on October 5, 2018. The judge presiding over that hearing found Plaintiff's account to be more credible than JK's and granted a one-year restraining order. That order was subsequently renewed by the court after the conclusion of the one year.

63.   In October 2018, CLARK moved forward with disciplinary proceedings against their three students who harassed Plaintiff online. Plaintiff was advised by CLARK that the three women admitted to the conduct and that they

would receive sanctions.   CLARK refused to tell Plaintiff what sanctions or protective measures were put in place.

64.   In February 2019, Plaintiff was participating in a fundraising event for a Spelman student organization to which she belonged.  That event was being held on CLARK's campus as CLARK was the only school in the AUC that had the requisite event space.  Plaintiff, through an advisor, asked the CLARK Title IX coordinator if they could prevent the three harassing CLARK students from attending.  The coordinator refused to exclude the three female CLARK students and those students attended the event.   At the event, the three engaged in various behaviors to make Plaintiff uncomfortable and unsafe and Plaintiff left her event early as a result.

65.   In the summer of 2019, Plaintiff was attending a program at MOREHOUSE as a student/employee doing research for which she was paid. Plaintiff was given housing on MOREHOUSE's campus, which Plaintiff accepted since JK would not be on campus during the summer.  For reasons unknown to Plaintiff, new MOREHOUSE Title IX coordinator Cassandra Tarver Ross told JK that Plaintiff was residing in the MOREHOUSE dorms.  Plaintiff was forced again to move into temporary housing.

66.   In October 2019, the harassment of and retaliation against Plaintiff continued. While Plaintiff attended a Homecoming event, JK showed up at the entrance to the event where Plaintiff was waiting in line to enter, and Plaintiff and JK saw each other.

67.   While Plaintiff was in the process of going through security to enter the party, JK physically shoved her, possibly so that he could enter the event before she did.

68.   At the time, JK was prohibited from being at the same location as Plaintiff due to the restraining order. Plaintiff reported this to the security personnel working the event and showed them the restraining order on her phone. JK was prohibited from entering the event.

69.   Inside the event, Plaintiff was with some of her friends when she noticed that a few of JK's female friends who had witnessed JK's assault on Plaintiff at the entrance to the event and his subsequent denial of entry by security were glaring at her. These were the same students who threatened violence against Plaintiff online in April and May of 2018. While her back was turned to the three female CLARK students, Plaintiff was shoved by the students. Those students continued to glare at Plaintiff for the remainder of her time at the party.

70.     Plaintiff reported both of these incidents to MOREHOUSE and CLARK respectively.

71.     MOREHOUSE to date has done nothing to address the physical assault of Plaintiff by JK.

72.     At the very end of Plaintiff's last semester at the AUC, MOREHOUSE finally made their determination and found JK not responsible for the four counts of dating violence and one count of sexual violence.  By the time the outcome was final on June 5, 2020, Plaintiff had graduated from Spelman.

73.     CLARK, meanwhile, had responded by indicating an interest in setting up a meeting with Plaintiff to start the Title IX process in early 2020.  But that meeting never happened, and CLARK Title IX coordinator Ramona Roman indicated that she would give Plaintiff an update after meeting with new legal counsel.

74.     Presumably after that meeting with CLARK's counsel, Plaintiff received an email from Roman that there was insufficient information to proceed with a Title IX complaint, despite Roman's neither having met with Plaintiff nor so much as commenced any investigation.

75.     When Plaintiff asked if JK could at least be restricted from CLARK's campus since he was not even enrolled at the AUC during Plaintiff's final semester, CLARK refused.

## EDUCATIONAL IMPACT

76.     The education impact of Defendants' indifference is hard to overstate. Plaintiff was forced to change her majors to avoid contact with JK and the retaliating CLARK students. She declined to register for particular classes on MOREHOUSE and CLARK's campuses in order to avoid ongoing retaliation, which prevented her from attaining her minor degree.  She avoided many AUC resources such as the library on CLARK'S campus in an effort to avoid these students.  She missed her pre-abroad coursework when she had to return home out of fear for her own safety. On multiple occasions, Plaintiff had to vacate her on campus residence out of fear of violence from JK or his friends.  Plaintiff's constant fear of threats coupled with actual violence deeply impacted her ability to focus on her education.  Her educational goals were derailed and her college years ruined due to Defendants' inaction.

77.     These consequences are precisely what Title IX is designed to prevent.

**FIRST CLAIM FOR RELIEF**
**Violation of Title IX, 20 U.S.C. § 1681(a)**
**Official Policy- Against MOREHOUSE**

78.     MOREHOUSE actively created a culture of sexual hostility and violence within its male student body by instituting policies and permitting practices that included, but are not limited to:

    a.      A policy of subjecting its male student body to little or no discipline;

    b.      A policy of actively discouraging or dismissing female students' access to help;

    c.      A policy of not reporting allegations of sexual violence and dating violence;

    d.      A policy of dragging out or otherwise delaying internal investigations of sexual assault and sexual violence;

    e.      A policy of not educating staff and students on sexual violence;

    f.      A policy of protecting the futures of male students over the safety of female students

    g.      A policy of deliberate indifference to sexual violence perpetrated by its students.

79.     MOREHOUSE's sexually hostile policies and practices were a proximate cause of Plaintiff's sexual harassment in the form of 1) sexual assault by JK, 2) a hostile educational environment suffered by Plaintiff for her remaining years at college, and 3) ongoing harassment by JK and his friends.

80.     The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits.

81.     As a result of MOREHOUSE's creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which MOREHOUSE is liable.

## SECOND CLAIM FOR RELIEF
### Violation of Title IX, 20 U.S.C. § 1681(a) -
### Deliberate Indifference - Against MOREHOUSE College

82.     Defendant MOREHOUSE was on actual notice of extreme gender-based harassment in the form of sexual assault suffered by Plaintiff when Plaintiff reported the assault to and cooperated with the Title IX office at MOREHOUSE.

83.     Defendant MOREHOUSE was on actual notice of the ongoing gender-based harassment and retaliation against Plaintiff as Plaintiff reported these instances to the MOREHOUSE Title IX office.

84.   MOREHOUSE administrators first actively discouraged Plaintiff from pursuing her complaint against JK, emphasizing the potential detriment to JK's future.

85.   The investigatory proceeding by MOREHOUSE was so delayed that it was more than two years later, concluding after Plaintiff having actually graduated, before it reached a final decision.

86.   MOREHOUSE's deliberate indifference to Plaintiff's rape exposed her to continued sexual harassment and retaliation that was so severe, pervasive, and objectively offensive that it effectively deprived her of access to meaningful educational opportunities and benefits, including academic opportunities in the form of classes on the MOREHOUSE campus and housing on the MOREHOUSE campus, as well as campus events and resources.

87.   Such behavior by MOREHOUSE subjected Plaintiff to discrimination on the basis of sex and made her more vulnerable to further harassment and abuse by subjecting her to attend school in a clearly hostile educational environment and defenseless against ongoing harassment by JK and his friends.

88.   Plaintiff has suffered damages as a result of MOREHOUSE's violations of Title IX in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### Violation of Title IX, 20 U.S.C. § 1681(a)
### Deliberate Indifference- Against CLARK

89.    After Plaintiff had reported her assault by JK to MOREHOUSE, she suffered retaliation in the form of ongoing harassment and eventually physical assaults by CLARK students who were friends with and accomplices of JK.

90.    This retaliation by the CLARK students was severe and pervasive where Plaintiff had previously been subjected to threats of harm or death by both JK and the CLARK students.

91.    Defendant CLARK and its administrators were on actual notice of the gender-based harassment suffered by Plaintiff when she reported both the online threats and the physical assault to CLARK administrators.

92.    Defendant CLARK failed to respond to Plaintiff's reported retaliation and assault, and the CLARK student-perpetrators, were never disciplined.

93.    Defendant CLARK deliberately chose not to conduct a Title IX investigation into the students reported by Plaintiff after learning of the harassment and assault and consulting with their general counsel.

94.    Such failure to investigate the assault, to conduct any Title IX disciplinary proceedings, or to contact Plaintiff to offer any assistance or resources was clearly unreasonable.

95.     CLARK's deliberate indifference to Plaintiff's ongoing harassment or assault exposed her to continued sexual harassment that was so severe, pervasive, and objectively offensive that it effectively barred her access to meaningful educational opportunities and benefits, including academic opportunities in the form of classes on the CLARK campus, as well as campus resources, events and activities.

96.     Additionally, such behavior by CLARK subjected Plaintiff to discrimination on the basis of sex and made her more vulnerable to further harassment and abuse by requiring her to either attend school in a clearly hostile educational environment or abandon all educational opportunities on the CLARK campus entirely.

97.     Plaintiff has suffered damages as a result of CLARK's violations of Title IX in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

On her claims for relief, Plaintiff seeks the following:

A.      An award of damages to be determined at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's expenses incurred as a consequence of the Defendants' actions; damages for deprivation of equal access to the educational benefits and opportunities provided by Defendants; and damages

for past, present and future emotional pain and suffering, and loss of enjoyment of life in an amount to be determined by the jury;

B.      Statutory and mandatory pre- and post-judgement interest on all sums awarded;

C.      An award of costs and attorney fees (pursuant to 42 U.S.C. § 1988(b)); and

D.      Any other relief as is proper.

Respectfully submitted this 24th day of June, 2021,

*/s/ Jonathan D. Grunberg*
Jonathan D. Grunberg
Georgia State Bar No. 869318
WADE, GRUNBERG & WILSON, LLC
1629 Monroe Drive
Atlanta, GA 30324
Telephone:   (404) 600-1153
Facsimile:    (404) 969-4333
jgrunberg@wgwlawfirm.com

John Clune
*Pro Hac Vice Admission Forthcoming*
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO  80302
Telephone: (303) 442-6514
Facsimile: (303) 442-6593
clune@hbcboulder.com

*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted this 24th day of June, 2021,

*/s/ Jonathan D. Grunberg*
Jonathan D. Grunberg
Georgia State Bar No. 869318
WADE, GRUNBERG & WILSON, LLC
1629 Monroe Drive
Atlanta, GA 30324
Telephone:   (404) 600-1153
Facsimile:    (404) 969-4333
jgrunberg@wgwlawfirm.com

John Clune
*Pro Hac Vice Admission Forthcoming*
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO  80302
Telephone: (303) 442-6514
Facsimile: (303) 442-6593
clune@hbcboulder.com

*Attorneys for Plaintiff*
